Submit this case and the parties will hear from us in due course. And the last case on our argument docket today is City Beverages v. Crown Imports. For the, uh, appellant's... Katie? Is that Christopher? It's for the appellant. For the appellant, I think. All right, we've got Christopher. I'm unable to hear Judge Gould. What's that? Ah, there. Now I can hear you. Thank you. Okay, for appellant, I think we've got Christopher Brain. And for appellant, Michael Vosk. The appellant can proceed. We've got this case set for 20 minutes per side. So if appellant wants to make a rebuttal argument, please stop before all the time's up. Thank you. May it please the Court, I'm Chris Brain representing Crown and Constellation, the appellants. And I would like to have a five-minute rebuttal period. This Court should reverse and vacate the District Court's order granting a preliminary injunction preventing Constellation from terminating its distribution agreement with Olympic Eagle because the Court's ruling was premised on the incorrect conclusion that the Washington Wholesale Distributor Supplier Equity Act prohibits without cause terminations. It does not. The ruling should be reversed for four reasons. The first, the plain language of RCW 126040, Grins 4, indicates that without cause termination of a beer distribution agreement is authorized. It basically says any termination. Secondly, the plain language also shows that the Washington Legislature did not intend to abrogate the existing common law right to terminate a distribution agreement without cause. The District Court reversed the analysis by concluding that the legislature was required to express an intent to permit without cause terminations when indeed what it needed to do was say you can't, which is a different standard. Third, the party's agreement expressly provides for a without cause termination and for an agreed remedy, and that agreed remedy was in the event of a without cause termination, you were compensated based upon the fair market value of the brand distribution rights. The statute permits the parties to agree to terminate without cause, and this agreement complied with that. Finally, FIPPA does not provide an alternative basis to affirm the ruling because the District Court correctly found that Olympic Eagle did not present any evidence to show that it was substantially associated with constellation and it does not qualify as a franchisee. The analysis here is to obviously determine what the intent of the legislature was in drafting this statute. Could I ask you a question going to the last point? Sure. I guess you called it FIPPA. I wasn't sure if it was FIPPA or FIPPA, but under FIPPA, are you contesting the marketing plan prong? Your Honor, there was no finding made at the trial court level on the first or third prong, and so we didn't put any facts into that, and I think that because there was no factual finding there and there was no evidence per se. I couldn't tell if you even contested it in the District Court, though. Are you basically conceding that that prong is met, or do you have arguments about why that prong isn't met? I think we have arguments, Your Honor. They're not the focus of our contest here because we believe it's resolved by the fact that there is no substantial association with the brands. And what test should we use for the substantial association prong? Okay. I think you have to use the one that was used in Atchley, which basically says you've got to show that there is a substantial association with the person you're dealing with, and here you've got a situation. This particular distributor, 20% of its volume is dealt with the Constellation brands. Over 65% of the volume is dealt with Anheuser-Busch, the Budweiser brands. And so when you have a truck that is delivering product, whether it has a Constellation brand on the label of the truck or it has an Anheuser-Busch or some other brand, that truck is loaded with all the products. And so the truck driver, when he takes the load into the store, he's got Budweiser, he's got Corona, he's got Modelo, he's got all the other brands in there. And so the reality is, in the eyes of the distributor, is that, excuse me, in the eyes of the retail establishment, is that truck driver or that truck, is it Constellation? No, it's a distributor. It seems like different states have used different tests for this franchise definition, though. And I'm having trouble figuring out which one Washington would choose. And we're not bound by, actually, so I'm not sure how we figure out what Washington thinks the definition should be. Well, I think we go back to that Washington has three elements for franchise. One of them is the right to sell or distribute goods. Two is that you'd be substantially associated with that trademark and commercial symbols. And three, you pay a franchise fee. And again, the court made no findings on the first and third. It made a finding that there was no substantial association because there was no evidence that there was any substantial association. But within association, it seems like some states use a percentage, some states still look at customers. I mean, it doesn't seem like it's all the same. Well, it's not all the same. But I think in Washington, we can go back to ATSLI, which is the Eastern District Washington District Court, which basically held that the test requires that the distributor show that its customers believed or could believe that it was associated with a supplier in a capacity other than a distributor. And remember, who are the customers here? We're not talking about a McDonald's where I or you go in and buy a hamburger and everything's labeled and it's a consistent menu. What we're talking about here is Washington has a three-tier distribution system for alcoholic beverages. One is the supplier, two is the distributor, and three is the retailer. So it's like Safeway or whatever your grocery stores are here. 7-Eleven or the restaurant you go to. And the thing about Washington is one and three, the supplier and the retailer, they don't deal directly. There has to be a distributor who's going from one to the other to the other. So if you're a chain store, you're told up above how much you're going to buy from each one and where it goes. And the bottom line being is the people at the store have got more than one distributor dealing with more than one product because they're not the exclusive distributor for alcoholic products. There's other ones. And so what happens is you have this multitude of different distributors and brands and they change hands from time to time just like they would have changed in this one, this case. So, again, I think it's the perception. The other test, Your Honor, that you're talking about is whether it is a complete dependency test. And I think that's the other one. In the complete dependency test, the courts have held, the Second Circuit held that a multiline distributor qualifies as a franchisee of one supplier if it is completely dependent on that supplier. This requires that most or all sales come from the purported franchisor's products. That's the percentage I was referring to. That's right. And here we're talking 20% and what they're talking about completely dependent, you know, more than 50% type situation. And I think there's another reason why the Franchise Act really isn't relevant here and that's this. The Franchise Act was passed in 1972 in Washington. The, I'll call it the act, the Malt Beverage Act was passed in 1984. Some states have taken beer distribution supply contracts and specifically put them under the Franchise Act. So there is no separate Malt Beverage Act. California is a state which has a similar act to Washington both as a Franchise Act and as a Malt Beverage Act. And in Washington, they adopted the first version of the act in 1984. And they knew at that time that we had a Franchise Act. If they had intended to have beer distribution supply contracts be a franchise, they could have easily engrafted it into that act. They did not do so. They created the Malt Beverage Act to deal specifically with It's our position that that act very clearly indicates it does not prohibit without-cost distributions. In fact, it has a, as we look at. Just to understand your legislative history point on this, are you saying that when they enacted the Wholesale Distributor Act specifically about malt beverages, prior to that, this would have been a franchise but then it no longer was? Or what are you saying? No, it was not a franchise before that. There was no restrictions. In fact, one of the reasons that the Malt Beverage Act was passed was because they were not franchisees. They weren't led into that. If they had been, I guess I'm having trouble understanding the point as well. Is it that the more specific governs over the general? Correct. I also, if I may, have one additional question about the Wholesale Distributor Act, and that has to do with subsection 2 about the notice and cure provision. Sure. 19.126.040 sub 2, which says a supplier must give the distributor at least 60 days written notice, unless it's for a particular reason that isn't relevant here. Was there 60 days notice here? I thought there was less than 60 days notice. Am I mistaken about that? You're mistaken, Your Honor. There was 60 days notice given. The contract had a provision that allowed for 30 days, but the statute supersedes that notice provision, so there was a full 60 days. Okay. I just wanted to get it. So when there isn't a reason, it says the notice must state all the reasons, and if there is no cause, what is the notice supposed to say? Well, Your Honor, in this particular situation, the facts are that Mr. Knight knew two days before the letter that it was going to be terminated without cause, because he received a phone call from John Williams on the 6th of September, and the letter went out as dated the 8th of September, and he was told it was going to be without cause. This notice did not specify any reason. So did it violate the act for not specifying a reason? Your Honor, at this point, I think that's a moot question, because if indeed the issue that is before you is whether or not we have a right to terminate without cause, we are going to have to issue a new notice. That notice is gone. It's been superseded. There was an injunction issued. So assuming this court ---- Well, is that right? I mean, if we were to vacate the injunction, why wouldn't that notice be the notice? Because, Your Honor, as a practical matter, we can't transfer. In a practical matter, we will give a 60-day notice and we'll say without cause. One of the things we also have to consider ---- And then would you also say something like a reason, like we prefer a different distributor or something? I don't think you have to give that reason, Your Honor. A without cause termination is not curable, because you have the right to do it for any reason, and that's the statutory language. Right, but there's another statute that says whatever your reason is, you have to give it. And so if ---- I mean, I can think of many just saying because we prefer not to deal with you anymore. I mean, it doesn't have to be what we normally think of as cause, but I don't understand how it isn't still part of the requirement to state why. Well, Your Honor, I can tell you what they would state why, because it's contained in the Declaration of John Williams, 3ER339, paragraph 13. Constellation made the decision to terminate after looking at shifts in the beer industry in terms of service models, route-to-market capabilities, retailer expectations, and consumer desires, and determining that the long-term interests of our dynamic portfolio are best served with a change in distributors. We could easily ---- Well, I'm not challenging that it's in the materials. I'm saying does it have to be in the notice to just say it's in our long-term interests to use someone else? Your Honor, I will not dispute the fact that it did not provide a reason, okay? But again, let's get down ---- You know, if in fact we didn't, we don't ---- No, so I'm just trying to ask you if you are going to have down this hypothetical road give a new notice, would it include the reason is we feel we would be better served to have a different arrangement? Right. Which is a reason. It is the reason, and the statute requires a reason. That's right, and I would just point out it's a non-curable reason, and it's within the discretion of Constellation to give that reason. And I think we would do that, but all I'm saying is we will have to do that because assuming that the injunction is reversed, you can't just go to somebody and say, you know, we're changing distributors tomorrow. We'll give a proper notice, and I'm representing to this Court that we will do that. Okay. Going back to the act, and I want to point out that the first sentence of Section 404 states, if any agreement of distributorship is terminated, canceled, or not renewed for any reason, and then it has three exceptions, other than for cause, failure to live up to the terms and conditions of the agreement, or for a reason set forth in RCW 19-126-0305. And those are basically the bad boy reasons. In other words, fraud, you lose your license, you file bankruptcy. So what it basically says, unless one of those three exceptions apply, the supplier is entitled to terminate the distributor, and the distributor is entitled to compensation because if one of those exceptions applies, there is no compensation structure. The legislature provided a remedy in the event of termination for any reason other than for cause, and certainly this includes termination without cause, otherwise this section and the entire compensation structure, which is in the 2009 Act, would be superfluous and meaningless. There's no point in having it there. Now, could the legislature have drafted a section that specifically addressed whether or not a section could be, without cause or whatever, would be prohibited? Yes, it could have. It could have easily started that out and provided that in the event of a termination, it could have stated, and reworded, excuse me, 040, it could have stated very articulately, quote, distribution agreements can only be terminated for good cause, failure to live up with the terms and conditions of the agreement, or a reason set forth in RCW 126-0530. It didn't. But the legislature knows how to do that because it did that very same thing in the Franchise Investment Protection Act. I was just going to ask you about that. Can I jump back to that for a second? Sure. Another one of your arguments is that we don't really need to talk about any of this because the distribution contract says that, basically, a liquidated damages clause, that whatever happens with a termination, here's the amount of money that we pay and that is waves of all other claims, and you're using that clause. Right. Is that clause legal under the FIPPA clause? So I know you think they're not a franchise, but just for a moment, say they are a franchise. If FIPPA applies, does FIPPA make that liquidated damages clause illegal? Your Honor, I don't have the answer to that question standing before you. I don't think it, I think the Franchise Investment Protection Act would prohibit the termination, so therefore you would not have a compensation clause. See what I'm saying? Maybe you would say they terminated, they need some remedy because it was illegal to terminate that way, so you get damages for the remedy. Maybe, but maybe it just couldn't happen at all, so that would suggest they could get an injunction if they can't do it at all. Right. And the Franchise Investment Protection Act makes it very clear. It says you cannot, it says it is unlawful to, and I'll quote, terminate a franchise prior to the expiration of its term except for good cause. They could have put that in, if they had wanted to, the Malt Beverage Act, but they didn't. They made it very clear. Right, right. Let's put aside the Malt Beverage Act. Assume we get to this FIPPA alternative ground for affirmance. What do we do with this FIPPA language that says you can't terminate? If we think they might be a franchise. I'm not sure whether we can get to your waiver argument or not at that point. Your Honor, again, with all due respect, I think the cart's before the horse here because there's a lot of factual issues that would have to be determined to get there. The issue before this court is that Judge Estudillo held that there was no substantial association, so therefore the three-part test was met. There is no franchise. Okay. And if indeed what they have done is they have attempted to meld number one, which is having the right to sell this product, with a substantial association, and our position is, and I think the law in Washington, and indeed there is no case that they can cite or that we have found that has an act like California, which I think you're referring to, has a malt beverage act similar to ours and it has a franchise act. There's no case which has linked a malt beverage distribution agreement to being also a franchise agreement, and I think that's the distinction as Judge Graper indicated. The specifics of this malt beverage act really do control the franchise act because the franchise act is very generic. This is dealing with the distribution of a specific product within a regulated industry of alcohol beverages. I only have 40 seconds, 46 seconds left. Yeah, Mr. Brain. Thank you. You'd like to reserve your remaining time? My remaining few seconds, yes, thank you. Well, just for planning purposes, I'll give you an extra minute to add to that. Thank you. Thank you. Okay, Mr. Vasco. Good afternoon. May it please the Court, and welcome to Seattle, Judge Friedland. Thank you. I'd like to take two minutes to make three introductory points. I realize you will have questions. First, the District Court followed the Washington Supreme Court's decision in Mount Hood v. Constellation, which it is bound to do sitting in diversity. Mount Hood v. Constellation interpreted the act to require Constellation, which is a party in both cases, obviously, to give notice and cause to terminate a distributor. In both cases, Constellation gave notice, but no cause or no reason for the termination. Mount Hood v. Constellation is not an outlier decision. Constellation cites no case in any jurisdiction under a beverage distribution statute where a court allowed a termination without cause. In effect, it asked this court to be the first in the nation to reach such a result. Number two, the District Court found that Olympic Eagle would be irreparably harmed if it lost the right to distribute Constellation's brands, including Modelo, which has become, recently, the best-selling single brand in America. Olympic Eagle told its now former bankers that the loss of these brands would be a Hindenburg-type disaster for the company, threatening not only its goodwill, but the future of the company as a going concern. And number three, my third point, the preliminary injunction merely, but importantly, preserves the status quo until there can be a final decision on the merits. Constellation does not challenge the findings of irreparable harm made by the District Court and didn't mention them at all in counsel's argument. In contrast, Constellation is not harmed at all by the preliminary injunction. It's stipulated to a $0 injunction bond. We can speculate as to why. It's because Constellation has given Olympic Eagle an award as its best distributor in the entire nation. The District Court... Also, let me ask you a question, if I may, about the Wholesale Distributor Act. I will start out by telling you I have a different understanding of what the Washington Supreme Court was doing in the Mount Hood Beverage case, which was about the dormant commerce clause on whether in-state wineries could be exempted from a rule that applied to everyone else. And there is, like, half a sentence that's about, you know, that to me is purely dictum. So I don't really view there as being a governing Supreme Court or even court of appeals case. And I know you don't agree with that, but I want to ask you why the legislature would have set out an entitlement to compensation that is to be figured out in a particular way if the agreement is terminated for any reason other than for cause, if they thought you couldn't terminate for any reason other than for cause. Well, the legislature provided two remedies in the statute for injunctive relief and also for fair market value of the brand rights. And as the district court here and in Stein recognized, there are many instances where a party will simply accept the termination without cause. It may be a minor brand. They may not want to fight a big company. Who knows what it is? And in that instance, the legislature set out a non-exclusive remedy for arbitration over exactly one issue. What's the fair market value? But it also provided for injunctive relief. And the reason it provided for injunctive relief is that it did not permit expressly or implicitly a termination without cause. Except that the statute I just read you, to me, very clearly contemplates a termination not for cause. That's why I asked you the question. I'm leaving out some words, but it says, if an agreement of distributorship is terminated for any reason other than for cause, the wholesale distributor is entitled to compensation to be calculated as follows. So that is, it seems to me, a clear indicator that the legislature anticipated that there would be terminations other than for cause, in which case there's a particular type of compensation to be awarded unless the parties have agreed otherwise. What's wrong with that reasoning? As the district court observed, there is one without cause reason that's specifically identified in the statute, and that is when one supplier sells a brand to another supplier. And the portion you were referencing actually includes that as well as some other reasons. But that is a without cause termination. But it says that that starts, that part at the end of that section four starts in the case of a terminated distribution rights resulting from the supplier acquiring. It's like a carve-out from the carve-out. I mean, that's like a, for example, in this particular one thing, this other thing happens. I don't understand how that governs the whole paragraph, that like tail at the end. Well, the, so we're talking about 0402? No, so I think what Judge, well, I think Judge Graber is reading 40 section four. Oh, section four. And it's the very end of it that talks about the acquiring the right for the supplier acquiring the right itself. That's the last sentence of section four. And that's what you were just talking about. Just one, I think I read it the same way Judge Friedland is suggesting, as an example that either is a subsection of one of the other things or just a whole other thought. Oh, by the way, here's another thing. Well, if I may, perhaps I can walk you through how I read the statute, because I don't think it starts, that's the end of the analysis. The beginning is in section 030, where the word reasons is used to describe terminations for, I'll call it bad acts, fraud, those kinds of things. So those are listed as reasons. But they're examples of reasons, right? They are example of reasons. I mean, another reason could just be, we don't feel like working with you anymore, right? That could be no reason. I would argue that is. That is a reason. Excuse me, it's not cause, but it's a reason. If I just prefer, I've gone to a lawyer that I liked for years, but I've met another lawyer I like even better. I've decided to change lawyers. It's a reason. It's not what we would consider leaving for cause. So why isn't? Well, if I may then, the next portion of the statute, which is 040, which is the distributor's protection. I should mention in 030, the legislature said very clearly that the distributor may terminate with notice and no cause. It didn't use the word no cause, but it says it may terminate with notice. So the legislature understood that it was empowering the distributor to terminate with no notice. That section is labeled supplier's protection.  I think it's even stronger, counsel. Just saying you can do it with notice, okay, or give a reason, okay. But it seems to me that subsection four is even more clearly allowing things that are not for cause. Any reason other than for cause. Well, if I may kind of work through the progression here. 040 then is the distributor's protection. And it says that the supplier must give the wholesale distributor 60 days prior notice, and we talked about what's in there. The next section, I think, or sentence is key. The notice must state all the reasons for the intended termination. All the reasons. That would include the incurable reasons that are referenced in 030, and then the curable reasons, which is why it goes on to say, upon receipt of the notice, the distributor has 60 days in which to rectify any claimed deficiency. Those words have to be read together because they're intended to be read together. You have incurable reasons and you have curable reasons. If it's incurable, if there is no claimed deficiency, it says you have to rectify any claimed deficiency if there is one. But if the reason given is we prefer to do business with someone else because we think they have better products or we like them better or because we think it's in our company's interest, that's a reason. You know, and so. Well, respectfully, Your Honor. The opposing counsel just did agree that that should be stated in the notice. The statute requires that it be stated in the notice, but I don't understand why that has any bearing on whether there's cause in the normal sense. Well, if that were the case, then Constellation, which was a party in Mount Hood, would not have prevailed. That was a dormant commerce clause challenge to the statute by out-of-state wineries. And in order to prevail, Constellation had to show that there was discrimination against the out-of-state wineries. Constellation argued to the Washington Supreme Court that there was discrimination because it could not terminate without cause. And that is, in fact, was the holding of Mount Hood versus Constellation. And it wasn't said once in passing. It was the entire holding. And you didn't ask about, counsel didn't mention the argument that showed up in their reply brief for the first time about why the words good cause are in the statute. But Mount Hood versus Constellation addressed that issue as well. Constellation asked the Washington Supreme Court to compare the Washington Act to the Illinois Act. It did that. It looked at them and it said that fair dealing act, the Illinois Act, like R2W 19.126, quote, required out-of-state wine suppliers to not cancel exclusive distribution agreements without notice and good cause, but exempted in-state wineries from its requirements. And it was based on that reading that the court said, the Washington court said that cause, that two statutes should be read alike and that they both prohibited without cause terminations. I would submit that is the holding. And Judge Estudillo sitting as a court in diversity followed, correctly followed the reasoning, whether you, whether you agree that it's part of the holding or whether it's something, it's the only authority in Washington on this issue. He correctly and did not abuse his discretion in following Mount Hood versus Constellation. So Mount Hood, I think you're looking at the passage on page 783 in the statutory history. Where the RCW is described and it's, they do have a little phrase that says without cause, but there's also discussion of notice. And it seems like the most important thing is the discussion of compensation, right? You have to pay for the inventory and the liquidated damages measured by the fair market price of the business. That's a significant requirement that if it doesn't apply equally in-state and out-of-state, that's huge amount of compensation. Isn't that way more important than the term? I mean, you can't say the only thing is whether it's without cause. Well, it is referenced in passing, but it's not part of the holding. I'm looking, I believe it's page 787 and I'll read it. Quote, by exempting all in-state wine producers from the definitions of suppliers, only out-of-state producers are subject to the statutory restrictions of 19.126.04, which requires them to give notice and cause before canceling contracts with suppliers. I think that's at page 787. But isn't it referring back to the full description earlier that talks also about the compensation? It's the same clause. There's no discussion. I have read this case many times. There's no discussion in this case beyond referencing that there is a compensation requirement and Constellation did not argue that to the Washington State Supreme Court. And if I may, so that decision, Mount Hood versus Constellation, was in 2003. In 2009, the Washington legislature amended the statute. It added two additional clauses. One was for fraud and one was for a supplier selling a brand to another supplier. It knew about Mount Hood versus Constellation and it did not touch the language, the operative language of the statute. Well, that may be because the legislature read it the way I'm reading it, which is obviously very different from the way that you're reading it. If Mount Hood is that easily subject to different interpretations, is this a question that we should certify to the Washington Supreme Court? Well, I think obviously that's a decision for you to make. There are clearly, if indeed you believe that there's two readings of the statute, which you're indicating you do, given... I'm asking about the case. I don't read the case as having really much to do with our question and you do. I clearly think there's a... I think there's only one reading of the statute, but the Washington Supreme Court is entitled to say otherwise, and so that's why I'm focusing not on the statute, but on the Mount Hood decision. Right, well... If it is subject to your interpretation, but it wasn't the main issue in the case... Well, the question before this court is... I'm sorry, Your Honor. The question before this court is whether the preliminary injunction should be affirmed, and if you believe there's a different reading of the statute than Judge Estadillo and Judge Stein before him in the district court, and Birkenwald, which came before Mount Hood, and Mount Hood, then that means there's serious questions as to the merits, but the balance of equities, as I mentioned in my introduction, tip so sharply in favor of Olympic Eagle that you should affirm the preliminary injunction, remand to the district court, and obviously if someone, if Constellation wants to certify this question or seek to certify this question to the Washington Supreme Court, they certainly have that right to do so. We've almost used up your time, do you? It looks like I have three and a half minutes. Hearing your thoughts about the other statute, FIPA. Well, FIPA, Washington courts, if you look at the East Wind decision, don't say you must look to California law, but both Ashley and Judge Estadillo followed East Wind and do look to California law. The test under California law is crystal clear on substantial association, and Constellation did not challenge the marketing plan element in the district court. We've put into the record evidence of a franchise fee being paid based on controlling Washington law, Lobedale versus Sugar and Spice. Advertising fee is a franchise fee. So the only question is substantial association, and Judge Estadillo said he would look to California law. That was not an abuse of discretion or an error of law. If California law applies, the test is crystal clear under Servo Snacks, but also as restated in the district court decision in Gabbana Golf, which was affirmed by the Ninth Circuit, and that is that substantial association is met if the distributor, in this case, the distributor is granted the right to use the trademark, logos, symbols, not just Constellation, but any of the brands, any of the symbols, or if it actually uses that right. It's a very clear test. Gabbana Golf did not get it wrong. The majority got it right. The minority in that decision tried to bring New Jersey law in to help out the franchisee and say, oh, there's another way to do it, which is customer perception, and the Ninth Circuit rejected that. So we're not bound by that because it wasn't published, and it doesn't seem like there's anything that we are bound by that's on point. So I'm not sure how we decide whether to look to New Jersey or California. Well, there's no Washington law that says look to New Jersey. The New Jersey statute is very different in its structure. New Jersey is just an example. I mean, how do we know that we should look to California as opposed to starting from scratch? They brought in the Connecticut cases, which I know quite well because of the Monster case, and Connecticut in grand light, it was the Second Circuit, decided to read the Connecticut statute very narrowly to say, basically, you look at the percentage of sales, okay, and there's a whole line of cases like that. The statute is different. The Washington statute, the relevant section they were referencing was the marketing plan, but let me skip ahead in the interest of time. Our Supreme Court in coast-to-coast stores took a very different interpretation of what the business means when the statute references the franchise business. In coast-to-coast, our Supreme Court, which it has now said three times, including most recently in the Lyons decision, said the business is what's under the franchise agreement. Because what's under the franchise, you can have multiple businesses under one company that are franchised, but because the business under the statute is what's under the franchise agreement, 100% of the business will always be related to that franchise. So they're very different. California has rejected a percentage of sales test in 3F, release 3F. It states it very clearly. Washington can't have a percentage of sales test because of the coast-to-coast decision. Some states have adopted a percentage test called fractional franchising. Washington has never adopted that test. Washington is in complete alignment with California. A district court is not abusing its discretion to follow California law. But that wouldn't be an abuse of discretion question, right? Wouldn't it be de novo? It would be de novo, correct. I'm out of time. If you have other questions, I'm happy to. Counsel, let me say this. You are out of time, but I'll add two minutes to your time. And just give you two more minutes because I'm giving some extra time to the appellant. Could I ask you a question about your trucks? Do they all have pictures of their products? The trucks have. It depends on which truck, but the trucks do have different pictures of different products. So there could be Budweiser on the truck. There could be. Our focus is not on the trucks, although that's the big, splashy picture. It's the $3 million in advertising in the local market. There's the national advertising fee. $3 million in advertising required by the agreement, the investment. But that's your franchise fee, right? That's how you satisfy the franchise fee. The national advertising fee is franchising. The local investment is all promoting the brand's logos. It's using the trademarks. It's the ServoSnacks 3F test. They have the right to use the trademark. They are using the trademark. That's where it comes from. So unless you have another question. These are wonderful questions. Thank you. I don't want to cut anyone off. A question from the panel? Hearing none. Okay. I just have a quick close then. The purpose of the preliminary injunction is, of course, to preserve the status quo. In this case, it's to help preserve a family business while the case proceeds to trial on the merits. This is consistent with the purpose of the Beverage Act, of the Beer Act, as I call it. The Act's purpose is to protect small businesses from the power of large beer suppliers like Constellation. The Act, in effect, says there is a place for family businesses in our seemingly ever more complex economy. And the district court said it best in his TRO oral ruling. He said there is something to be said about being a business owner and being able to pass that down to the next generation and keeping that type of pride and livelihood alive. So I do think there is irreparable harm at this point. The next generation of Olympic Eagles leaders are in this courtroom. And we respectfully ask you, on their behalf and on behalf of the company, to affirm the preliminary injunction to preserve the status quo while the parties proceed to the merits of this litigation. Thank you very much. Thanks, Mr. Vesk. Mr. Brain. Thank you. I'm going to make some quick points. First of all, this is a question of statutory termination. The Malt Beverage Act allows for a without cause termination. If it is allowed, then these other issues are not on the table. Council brought up Mt. Hood. I tried Mt. Hood. I argued Mt. Hood at the Supreme Court. The issue was the disparity in the rights of an in-state winery versus an out-state winery. That was the issue. And I also would point out, as to Mt. Hood, go to page 104. Your Honor, I think you did read that. It says that the statute enhances contractual rights, generally prohibiting without cause terminations. And then it goes on to say, if you don't comply with that, the supplier terminates the distribution contract without following the requirement. The statute provides the distributors entitled to compensation. The point is it follows the act. That's Mt. Hood. So I think his interpretation of it is just completely off-base. Secondly, he talks about the lender not being told that it was the Hindenburg event. Well, he didn't tell the lender the $70 million that they had been offered for these brands. Okay? They had been offered $70 million as compensation. That is not chicken feed in anybody's book. It's a big dollar value. I'd also like to point out, Your Honor, that the 2009 amendments greatly expanded the issue. He points to the supplier change. That came from Mt. Hood because Mt. Hood and Sebastiani sold a portion of its line to Constellation. Constellation had a different distributor. They claimed Sebastiani should be liable for that line, but because they didn't supply it anymore, they couldn't be, so they didn't. Well, they amended the act to make the successor distributor liable. It took care of that problem, and that's why that section's there. Finally, Your Honor— That's all. Oh, I'm sorry. You are running out of time, but I do have one question about your very first statement, which is this is all about the Distributor Act. If we were to agree with you about that, wouldn't we still have to figure out whether FIPA or FIPA applies? And if so, how? I think what you would do is—first of all, there's no injunctive relief based on FIPA. So the point being is he's asking you to do a different test than what the statute says, the substantial association. What do you mean by there's no injunctive relief based on FIPA? Do you mean FIPA doesn't qualify? There's no order. There's no preliminary injunction based upon FIPA. The Court did not order it. Only it said there was no right to an injunction based on FIPA. Well, but that's before us, too, because they can ask for an affirmance on a different ground. That is sort of standard. So they're saying, well, if you don't agree with us on Part A, go to Part B, and we should win because the Court was wrong. So I guess I don't understand how we would avoid doing that. I've got another answer for you, and that is remember the Malt Beverage Act is the specific— which is a different subdivision of the Act. It says that a person injured by a violation of the Act can seek injunctive relief. That's what he said. But you know what? They exclude 0404. You can't get injunctive relief if you have a—if it's a not-for-cause termination. But that's still—if we think you're right that the Act—you win under the Act, we still then could look at whether there's an alternative ground for affirmance based on likelihood of success under FIPA. Because the balance of equities and everything—if it's a likelihood of success, that's de novo, and why not look at a different statute? The Court—all I'm going to say is Judge Estudillo did not find that there was a likelihood of success under FIPA. Right. We know that. But that question we reviewed de novo, right? True. So I'm not sure how we avoid FIPA if we agree with you about the Act, unless there's some waiver or some— I mean, you had the waiver argument, so that might be a way. But it seems like you're not—I'm not following why you think we don't have to do FIPA. Well, I'm not saying you don't have to, Your Honor. What I'm saying is I don't think that their test meets the standards, and I think you should look at Atchley, which talks about a multibrand distributor and why it doesn't fit. This is not like a McDonald's store. It's not like a typical—what we think of as a franchisee. This is a distributor who has a truck. For example, there are 32 pages of products in their list. Two pages are Constellation products. All of those products go on the same truck. Are they a franchisee of AB? Are they a franchisee of all of those other brands? You can't wear all those different hats. You can't have McDonald's. You can't have Burger King, and you can't have Jack in the Box all in the same restaurant, and that's what they're trying to do. Well, sometimes they do. They'll have, like, a Pizza Hut and a Dunkin' Donuts in the same place, right? You could do that. Those are different products. Those are not all alcoholic products. They're not all donuts. Go ahead. I wanted to follow up on something you said about 080, which I don't have in front of me, and you say that that precludes an injunction in the no-cause situation or in the 040 situation. Is it your view that that would override, in a sense, the opportunity to get an injunction under the Franchise Act? I don't know if it—Your Honor, I think, again, you have to look at what's the— That's my position because it's specific. They could have incorporated this into the Franchise Act. They didn't. They created a whole new section, and then they improved that section in 2009, and it states, What does that say? If it's any other reason, your remedy is compensation, and you can't get injunctive relief. And what I'm saying is this Act should override FIPPA. Yeah, well, I think the— Thank you. The excellent arguments of counsel have certainly engaged the panel, and we thank you. Unless I hear further questions from Judge Graper or Judge Friedland, we will now submit this case, and the parties will hear from us in due course. So I thank you both for the excellent arguments. And, Stacy, this case is submitted.
judges: GRABER, GOULD, FRIEDLAND